## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| Aracely Lopez, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | Civil Action No. 12-00062-CG |
| | ) | |
| v. | ) | Criminal No. 07-00349-CG-N |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

Petitioner Aracely Lopez, a federal prison inmate represented by counsel, has filed a timely motion to vacate, set aside, or correct her sentence, and memorandum in support, pursuant to 28 U.S.C. § 2255 (Docs. 204, 209). The United States has filed a response in opposition (Doc. 215). And the petitioner has replied (*see* Doc. 216.) After an evidentiary hearing, conducted April 1, 2014, at which the petitioner and her trial counsel, Domingo Soto, testified (*see* Docs. 227, 235, 247, 255),[1] this action is now before the undersigned United States Magistrate Judge for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Rule 8(b) of the Rules Governing Section 2255 Proceedings, and Local Rule 72.2(c)(4). For the reasons explained herein, it is **RECOMMENDED** that Aracely Lopez's § 2255 petition be **DENIED** and that the Court find that she is not entitled to a certificate of appealability and is therefore not entitled to appeal *in forma pauperis*.[2]

---

[1]     A translator was present during the hearing for Aracely.

[2]     Aracely's daughter, Elda Lopez, was one of her co-defendants. Although

# I.   Underlying Criminal Case and Direct Appeal

## A.   Procedural Background

On April 25, 2008, Aracely was indicted by a superseding indictment for violating 21 U.S.C. § 846, conspiracy to possess with intent to distribute approximately 315 kilograms of cocaine (Count One); for violating 18 U.S.C. § 1956(a)(1)(B)(I), conspiracy to commit money laundering (Count Two); and for violating 18 U.S.C. § 1956(h), money laundering (Counts 3-9, 11-18, and 20-22) (Doc. 95-5 (redacted superseding indictment)).   On January 5, 2009, trial commenced against Aracely and two codefendants, her daughter Elda and Ramon Garza, Jr.   Aracely was represented at trial by Domingo Soto.[3]   After five days of trial, Aracely was found guilty on all counts.   (*See* Docs. 90, 93.)   At the conclusion of Aracely's sentencing hearing, which was conducted on April 14, 2009, Judge Granade sentenced her to 240 months in prison.   (*See* Doc. 139.)   Judgment was so entered on April 16, 2009.   (*Id.*)

On April 23, 2009, Aracely's appellate counsel, James Stafford, also her counsel in this proceeding, filed a Notice of Appeal on her behalf (Doc. 148).   On

---

Aracely and Elda were represented by separate, retained counsel at their trial—and are now represented by separate, retained counsel—the issues they raise in this collateral proceeding are substantively the same.   In fact, Aracley and Elda filed a joint motion in support of their petitions (Doc. 209), to which the Government filed a joint response (Doc. 215).   They also filed a joint reply (Doc. 216), which was inadvertently docketed twice (*see* Doc. 217).   However, because separate civil cases have been opened as to each defendant and, moreover, because each defendant's ineffective assistance claim must be examined independently—focusing on the alleged actions or inactions of each defendant's trial counsel—a separate report and recommendation is entered as to each.

[3]      As he testified, Mr. Soto has practiced primarily, if not exclusively, criminal defense work, in state and federal court, for more than twenty-five years.   He is also a member of this Court's Criminal Justice Act ("CJA") panel.

appeal, Aracely argued that that the evidence was insufficient on each of the counts against her.  *See United States v. Lopez*, 403 Fed. App'x 362, 372 (11th Cir. Nov. 12, 2010) (per curiam).  She also challenged the reasonableness of her sentence.  *See id.* at 380.   The Eleventh Circuit, however, affirmed Aracely's sentence, finding no merit to her claims.  *See id.* at 381.

**B.     Pertinent Factual Background**

Having reviewed the entire trial transcript, the undersigned sets forth the facts relevant to a determination of the pending petition:

The investigation of a cocaine distribution cell led police to Alvin Knox, a major cocaine distributor in Alabama.  Knox was arrested and, pursuant to a plea agreement, pleaded guilty and agreed to provide assistance to the Government in exchange for the Government's promise to make his cooperation known to the Court at sentencing.   Alvin Knox's cooperation ultimately led law enforcement to the defendants in this action: Ramon Garza, Aracely Lopez, and her daughters Elda and Belinda Lopez.

Alvin testified that his father, Benjamin, introduced him to the drug distribution business in 1999 and supplied him with drugs.   Benjamin, in turn, originally received his drugs from a man named Paul Harris.   But Benjamin and Harris parted ways, and that is when, according to Alvin, the defendants entered the picture.   During this period, Alvin and Benjamin were running two family businesses—their lucrative drug distribution business and a car lot and towing service, known as Premier Auto Sales.   Premier Auto was owned by Alvin.   By

Alvin's own admission, that business served as a front to "cover up" and "legitimize" his drug money.  (Doc. 168 at 121.)

Three convicted drug distributors who purchased cocaine and marijuana from Alvin and Benjamin testified at trial.[4]  Tony Preston testified that during one period he was selling ten kilograms of cocaine obtained from Alvin every week.  Derrick Coston received a kilogram of powder cocaine from Alvin each week from 1999 to 2003.  Kerry Coston testified that he received ten kilograms of cocaine per month from Alvin from 1999 until 2003.  Alvin also provided Eric White and Gerard Terrell with ten kilograms of cocaine every month during that period.

Alvin testified that he first met Garza and Aracely in late 2000, but that his father had met Garza earlier.  Aracely was Garza's wife.[5]  Alvin first met Aracely's daughters, including Elda, sometime during 2000 or 2001.  Alvin's initial meeting with Garza and Aracely occurred in a hotel room in a Texas town near the Mexican border.  Benjamin was also at that meeting.  The next day, Benjamin and Alvin visited Garza and Aracely's residence before traveling with Garza to a trailer.  At the trailer, Garza had some money that had been matted together sitting in a pot of water.  Benjamin and Garza discussed how to separate the money, and Garza gave the money to Benjamin to see if Benjamin could separate it.  Federal agents recovered that money when they executed a search warrant at one of Alvin's two

---

[4]     Alvin testified that he also distributed drugs to at least three other distributors: Steven Preston, Gerard Terrell, and Eric White.

[5]     At the April 1, 2014 evidentiary hearing, Aracley testified they were not married.

houses in Tuskegee, Alabama, in March of 2001.

Alvin testified that a business relationship developed out of Benjamin and Alvin's initial meeting with Garza and Aracely. In early 2001, Benjamin began making trips to Texas every few weeks to pick up drugs. Aracely's brother was reportedly the source of the cocaine. Benjamin would drive to Texas in different Lincoln Town Cars. Cash would be hidden in secret compartments behind the dash. Garza would tell Benjamin where the delivery would occur, and Benjamin would pick up approximately eight to eleven kilograms of cocaine on every trip. He would return to Alabama with the cocaine hidden in the secret compartments, and Benjamin and Alvin would then distribute the cocaine to their crew for sale.

On February 20, 2001, Alvin was arrested in the Atlanta airport after authorities discovered approximately $80,000 in cash strapped around his waist and his girlfriend's waist. He was flying to Texas to deliver that money to Benjamin, who had already driven there. Alvin and Benjamin had planned to give the money to Garza as a payment for drugs.

In 2002, Alvin purchased a Chevy Tahoe from an auto dealer in Montgomery, Alabama, and had it registered in Benjamin's name. At trial, Alvin testified that Garza had installed hidden compartments in the Tahoe. Garza and Aracely then traveled to Alabama to pick up the Tahoe, which they drove to New York. Once the Tahoe arrived in New York, it was to be loaded with fifty or more kilograms of cocaine. The plan was for Garza and Aracely to retrieve the Tahoe after it had been loaded with cocaine and return it to Benjamin. Things did not go as planned.

Former New York City police officer Edgardo Torres testified that on the afternoon of April 4, 2002, he was flagged down by a shop owner who said that someone in the building across the street had a gun' The building across the street was a large garage.  Inside the garage, Torres observed three men standing over people on the ground and striking them.  When Torres and his partner drew their weapons, the attackers fled.  The police cornered and captured one of the attackers before returning to check on the victims, who turned out to be Garza and Aracely.  They explained to the police that they were in the garage to pick up a vehicle and that the attackers had intended to rob them.  The vehicle was the same Chevy Tahoe that Alvin had purchased and registered in Benjamin's name.  Garza and Aracely said it belonged to a friend.

The police took Garza and Aracely to a hospital.  The two were being treated as victims at that point so the police did not watch them closely.  Garza and Aracely left the hospital.  Meanwhile, back at the precinct, the attacker who was arrested explained that he was there to rob Aracely and Garza because there were drugs in the vehicle.  Because the garage was about to close for the evening, the owner moved the Tahoe to a parking garage across the street so that Garza could retrieve it.  The police returned to the area near the garage, where they waited for the couple to return to pick up the Tahoe.  Garza and Aracely arrived in separate vehicles.  Aracely departed unimpeded, but when Garza tried to drive the Tahoe out of the parking garage, the police arrested him.  Garza consented to a search of the vehicle, and the search turned up eleven kilograms of cocaine hidden in a secret

compartment underneath the rear window.  Alvin testified that Garza told him that not all of the cocaine was discovered; some of it remained hidden in the vehicle after the initial police search.

Garza was incarcerated after his arrest, and the Tahoe and drugs were confiscated.  Alvin testified that, after Garza's incarceration, Alvin and Benjamin did business with Aracely directly.   Because Aracely had difficulty speaking English, Benjamin and Alvin communicated with her through her daughters, Elda and Belinda Lopez.[6]  Alvin testified that his first conversation with Elda occurred about two to six months after Garza was incarcerated.  Alvin spoke to Aracely through Elda over the telephone and in person.  On at least one occasion, Elda flew to Mobile, Alabama, to interpret discussions between Aracely and Alvin.  Alvin testified that, based on the nature of the conversations he had with Aracely that were interpreted by Elda, there was no way that Elda did not know that the conversations concerned drug deals.

Alvin also testified that, as a result of the conversations he had with Aracely through Elda, he arranged two cocaine deals.  The sales occurred during 2002.  The first deal involved 102 kilograms of cocaine, and the second involved 109 kilograms. The cocaine was delivered to Premier Auto in two shipments by an eighteen-wheeler.  Alvin and Benjamin arranged to pay Aracely for the cocaine at a later date.  They successfully paid Aracely $1.2 million in cash for the cocaine, but they

---

[4]     Belinda Lopez, who was also charged in the indictment, remains a fugitive.

ran into trouble attempting to deliver the rest of the payment.[7]

Evidence at trial showed that Aracely and her daughter Belinda flew from Harlingen, Texas to New Orleans on December 16, 2002 and returned from New Orleans to Harlingen on December 18, 2002.  FBI Special Agent Ruth Kroona testified that phone records from phone numbers registered to Elda Lopez or Irasema Lopez revealed that numerous phone calls were made between those phones and Alvin's phone on December 17, 2002, and that the phone records showed that the Lopez phone was roaming in Mobile on that date.  Evidence also showed that there were phone calls between Alvin's phone and his known drug associates on that date.

In January 2003, Benjamin was stopped by police while driving a Lincoln Town Car through Refugio, Texas.  The officer who stopped him discovered bundles of money wrapped in green cellophane hidden in a secret compartment in the car's dashboard.  Law enforcement seized about $340,000.  Alvin testified that Benjamin was en route to deliver the money to Aracely when he was stopped.  This money was to be payment for the cocaine that Alvin and Benjamin had already received.  Testimony at trial indicated that Aracely's daughters called and had discussions with Alvin about the lost payment.

In 2004, Garza was released from prison and reestablished a relationship with the Knoxes.  According to Alvin, during one of Garza's trips to Alabama, Garza

---

[7]      Although there was testimony at trial concerning Alvin's lavish lifestyle (i.e., multiple homes, multiple expensive automobiles, lavish party weekends in Atlanta), there was no evidence that Aracely had such a lifestyle.

asked Alvin for money to pay off the debt Alvin and Benjamin owed Aracely as a result of Benjamin's run-in with the law in Texas. Alvin gave Garza $300,000 for delivery to Aracely. After Alvin made that payment to Garza, Aracely stopped contacting him about the drug debt.

In order to prove the money laundering counts, the Government introduced evidence concerning the defendants' businesses and financial transactions. The Government's position was that Aracely used banking transactions and sham businesses to disguise her drug distribution income as legitimate wealth.

Travis Ward, a construction worker from Arkansas, testified that, in 2003, he became aware that a friend of his, Richard Finch, was selling marijuana. Ward helped Finch hide 400 pounds of marijuana, after which Finch gave Ward money and instructed him to purchase two cashier's checks. Ward testified that the money was drug proceeds. On October 4, 2003, Finch took Ward to two banks. Following Finch's instructions, Ward purchased one cashier's check for $9,000 and another for $3,000. The first check was made out to Jesus Garza, and the second check was made out to Irma Garza.[8] After purchasing the checks, Ward gave them to Finch. The Government traced the cashier's checks and determined that they were each endorsed by the payees and by Aracely and deposited into one of Aracely's bank accounts on October 6, 2003. The next day, Aracely wrote a counter check for $12,000—the sum total of the two cashier's checks—and cashed it. Counts Three and Four charged Garza and Aracely with substantive counts of money laundering

---

[5]    It is unclear from the record whether these two people are relatives of Ramon Garza.

9

based on the purchases of the $3,000 and $9,000 checks.   Count Five charged Aracely with money laundering based on the purchase of a $12,000 check.

The Government also introduced the testimony of Special Agent Victor Henken, who works with the criminal investigations unit of the Internal Revenue Service.   Henken had conducted an investigation aimed at identifying money laundering financial transactions committed by Garza, Aracely, and Elda.   Henken discussed various companies with which the defendants were affiliated from 2000 through 2006.   He relied heavily on the defendants' tax records in conducting his investigation.

Henken testified that in 2000 and 2001, Aracely reported income from a Schedule C business known as Espinos Cap Sales on her individual tax returns. Henken explained that in a Schedule C business, the individual filing the tax return is in business for herself.   From 2000 to 2006, Espinos Cap Sales made no filings with the IRS.   In 2002 and 2003, Aracely reported income from another Schedule C business—Textiles BISE—that made no filings with the IRS from 2000 to 2006.

Elda reported income from Custom Clay Products in 2003, listing it as a Schedule C business.   She also had income from Custom Clay in 2004 and 2005, but for those years the income was reported on a W-2 tax form as wages rather than as Schedule C income.   In 2004 and 2005, Aracely reported wage income from Custom Clay.   From September 2000 until March 29, 2001, Garza stayed at a halfway house following a term of incarceration.   He filed paperwork with the halfway house stating that his employer during that period was Custom Clay Products.   Alfredo

Saenz, a former friend of Garza, testified that Garza had used Custom Clay's vehicles to transport drugs.

Custom Clay filed no corporate income tax returns for any year after 2000, but it did file highway use tax forms from 2001 to 2005, indicating that the business was operating trucks during those years. Agent Henken found it noteworthy that Custom Clay did not file income tax returns despite having trucks on the road, saying, "[Y]ou would think that those trucks would be generating income that would be reported on an income tax return. But I did not find any income tax returns." (Doc. 170 at 588.)

On documents other than tax filings, Aracely claimed that a business called San Francisco Warehouse was her principal employer. That company did not file income tax records between 2000 and 2006. In 2007, Aracely made a Schedule C filing related to San Francisco Warehouse, but that filing provided only gross income. In other words, it did not list any business expenses associated with purchases of inventory. Agent Henken considered the absence of listed business expenses an anomaly, stating that "[n]ormally if you have a warehouse you would buy the goods that go into the warehouse and then sell those goods." (Doc. 170 at 586.) He testified that the lack of records indicating the cost of goods sold made it seem as if the business was just given items to sell. He further observed that none of the Schedule C filings made by the defendants listed business expenses, and that it appeared that the defendants were using Schedule C filings to explain instances when they received money that was not listed on a W-2 form as wages.

Agent Henken also described the results of a search carried out at the San Francisco Warehouse in Rio Grande City, Texas.  He found no accounting software, spreadsheets, or summaries of business income or expenses on a computer seized from the warehouse.  While Henken did recover some spiral notebooks and note cards containing what appeared to be accounts receivable related to sales of furniture in 2007 and 2008, he did not find any corresponding totals of accounts receivable as would be expected in a functioning and ongoing business.

Henken said that businesses are often used as fronts to disguise the proceeds of drug trafficking and that a business that would otherwise fail could be kept afloat by an infusion of drug money.  He discussed multiple purchases of furniture made by Aracely and Elda from wholesalers between 2004 and 2006, and testified that those purchases were made for sale rather than personal use.  Aracely made most of the purchases, with very few purchases made in Elda's name.  Also, most of the purchases were accomplished by wire transfer rather than check.  Henken testified that he noticed irregular influxes of unexplained cash into San Francisco Warehouse just before large payments, such as furniture purchases, were made.  Henken had observed that pattern of activity in other businesses serving as fronts for illegal activity.

Agent Henken also testified that "the purchase of furniture, potentially as a cover load, would represent money-laundering transactions."  (Doc. 170 at 646.) Alvin testified that, before Garza was arrested in New York, Garza told him that buying furniture by the truckload would be a good way to conceal the transport of

drugs and drug proceeds, and that after the drugs were transported, the furniture could be sold. Counts Six, Seven, Nine, Eleven, Sixteen, and Twenty through Twenty-two each charged Aracely with a substantive count of money laundering related to furniture purchases for San Francisco Warehouse.

Finally, Agent Henken described his analysis of the bank records for accounts belonging to Garza, Aracely, Elda, and Belinda. He determined that, from 2000 through 2006, those four individuals deposited $249,842 in cash into their accounts. Henken noted that the total of cash deposits exceeded the combined adjusted gross income of $166,767 that Garza, Aracely, Elda, and Belinda reported during that same period. He also observed that the cash deposits appeared not to be of a regular amount or on a recurring basis, but instead were sporadic. He noted that just after large cash deposits would be made a large check or wire transfer would be issued. According to Henken, that pattern of activity is indicative of money laundering. (*See* Doc. 170 at 6-7.)

Counts Twelve, Thirteen, Fourteen, Fifteen, Seventeen, and Eighteen charged Aracely with money laundering based on cash deposits into her bank accounts. Counts Ten and Nineteen similarly charged Elda. Each of those alleged transactions involved cash in an amount below the $10,000 reporting threshold.

## II.   <u>Collateral Attack</u>

Aracely argues that her conviction and sentence should be vacated, set aside, or corrected for two reasons: (1) her trial counsel, Mr. Soto, rendered constitutionally ineffective representation (*see* Doc. 209 at 10-19); and (2) she was denied her right under the Sixth Amendment to a fair and impartial jury (*see id.* at

19-20).  The Government contends Aracely's § 2255 petition is due to be denied because she cannot meet the *Strickland* requirements as to her claim of ineffective assistance of counsel and because her claim that she was denied a fair and impartial jury is barred by procedural default and/or collateral estoppel.

Regarding the second claim for relief, the Government correctly notes that this Court has already considered that matter.  Both Aracely and Elda claim that one of the jurors was seen talking to the prosecutor during a trial break.  Elda filed a motion for leave to communicate with jurors (Doc. 195), and this issue came before the Court at an evidentiary hearing, held February 3, 2012.  After hearing testimony from four of the defendants' witnesses, the Court entered an order on February 8, 2012 (Doc. 208) finding (1) "[a]fter careful review and consideration of the affidavits and testimony presented by [Elda] Lopez, . . . she has failed to meet her evidentiary burden of proof by a preponderance of credible evidence"; and (2) "the credibility of the factual accounts of the government witnesses far outweighs the credibility of the accounts of prosecution contact with jurors as given by the defense witnesses."  (*Id.* at 11.)  Elda's motion was denied.  And neither Elda nor Aracely took further action as to this issue.  In their joint memorandum in support of the § 2255 petitions, in fact, they candidly admit that, because of the February 8, 2012 ruling, they "are unable to further develop this claim."  It is therefore **RECOMMENDED** that this claim be **DENIED**.

## A.    Ineffectiveness Standard

Turning to her first claim for relief, to establish ineffective assistance of

counsel, Aracely is required to show *both* that her counsel's conduct fell below "an objective standard of reasonableness"—the "performance prong"—*and* that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different—the "prejudice prong." *See generally Strickland v. Washington*, 466 U.S. 668 (1984). She "bears the burden of proof" as to both prongs—"both prongs must be proved to prevail." *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001), *cert. denied sub nom. Johnson v. Nagle*, 535 U.S. 926 (2002); *accord Cooper v. Secretary, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011).

To succeed on the performance prong, Aracely "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. "When analyzing ineffective-assistance claims, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (citations omitted); *accord Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005). That "presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." *Callahan v. Campbell*, 427 F.3d 897, 933 (11th Cir. 2005). As the Supreme Court has explained,

> "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be

> applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-90. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689. The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Id.* at 690.

*Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770, 788 (2011) (some internal citations modified or omitted); *see also Pair v. Cummins*, 373 Fed. App'x 979, 981-82 (11th Cir. Apr. 20, 2010) (per curiam) ("The performance prong['s] . . . standard is that of a reasonable attorney, not a 'paragon of the bar' or an 'Aristotle' or a 'Clarence Darrow.'" (quoting *Dill v. Allen*, 488 F.3d 1344, 1354 (11th Cir. 2007); *Yarborough v. Gentry*, 540 U.S. 1, 11 (2003))); *Gonzalez v. United States*, Nos. 09–22386–Cv–JORDAN; 07–20759–Cr–JORDAN, 2010 WL 2367356, at *5 (S.D. Fla. Apr. 21, 2010) ("The court's role in reviewing ineffective assistance of counsel claims is not to 'grade a lawyer's performance; instead, [the court] determine[s] only whether a lawyer's performance was within 'wide range of professionally competent assistance.'" (quoting *Van Poyck v. Florida Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002))), *report and recommendation adopted*, 2010 WL 2366531 (S.D. Fla. June 14, 2010).

"The test for [deficiency, moreover,] is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more." *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir.

16

1995) (en banc).  Rather, the inquiry under *Strickland* is limited to "whether some reasonable lawyer could have acted, in the circumstances, as defense counsel acted . . . ." *Conklin v. Schoefield*, 366 F.3d 1191, 1204 (11th Cir. 2004) (quoting *Waters*, 46 F.3d at 1518); *see also Moreno v. United States*, Criminal No. 1:06–CR–461–CC–GGB; Civil Action No. 1:10–CV–0164–CC–GGB, 2012 WL 7829200, at *4 (N.D. Ga. Mar. 13, 2012) ("The test [for deficiency] has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992))), *report and recommendation adopted*, 2013 WL 1339718 (N.D. Ga. Apr. 1, 2013); *id.* ("[P]etitioner must demonstrate that 'no competent counsel would have taken the action that his counsel did take.'" (quoting *United States v. Freixas*, 332 F.3d 1314, 1319-20 (11th Cir. 2003))).

And, in order to avoid "the distorting effects of hindsight,"[9] a habeas court must "evaluate the reasonableness from counsel's perspective at the time of the alleged error in light of all circumstances of the case." *Griffin v. United States*, 204 Fed App'x 792, 794-95 (11th Cir. Oct. 25, 2006) (per curiam) (citing *Strickland*, 466 U.S. at 690).  Likewise, "[t]actical decisions regarding trial strategy are left to the sound judgment of counsel and are entitled to a 'strong presumption' of

---

[9]     "*Strickland* anticipated the temptation 'to second-guess counsel's assistance after conviction or adverse sentence' and cautioned that '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Rompilla v. Beard*, 545 U.S. 374, 408 (2005) (Kennedy, J., dissenting) (quoting 466 U.S. at 689)).

competence." *Kearney v. United States*, Nos. 2:04–CR–15–1–BO; 2:09–CV–55–BO, 2010 WL 2402887, at *2 (E.D.N.C. June 14, 2010) (quoting *Strickland*, 466 U.S. at 689, and citing *Bell v. Cone*, 535 U.S. 685, 698 (2002)).   For a petition challenging chosen trial strategies to be successful, therefore, it must not be "devoid of the factual basis that is required to show that counsel's tactics were manifestly unreasonable." *Id.*

In addition, Aracely "must affirmatively prove prejudice" to succeed on an ineffective assistance of counsel claim.  *Butcher v. United States*, 368 F.3d 1290, 1294 (11th Cir. 2004).   "[T]hat the errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice.  *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (alteration in original) (quoting *Strickland*, 466 U.S. at 693); *see also Evans v. Secretary, Fla. Dep't of Corr.*, 699 F.3d 1249, 1270 (11th Cir. 2012) (under *Strickland*, "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors," and that "[t]he likelihood of a different result must be substantial, not just conceivable" (citations omitted)).

Finally, when applying the *Strickland* standard, it is clear that courts "are free to dispose of ineffectiveness claims on either of its two grounds."  *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998) (citation omitted), *cert. denied sub nom. Oats v. Moore*, 527 U.S. 1008 (1999); *see also Butcher*, 368 F.3d at 1293 ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").

### B.   Analysis

Aracely contends that her trial counsel was ineffective because (1) he failed to investigate the case; (2) he failed to allow her to testify; and (3) he failed to present exculpatory and mitigating evidence.   Because the Government failed to offer an affidavit or declaration from Mr. Soto, Aracely's second contention prompted an evidentiary hearing to assist in determining whether the dual prongs of *Strickland* could be satisfied.[10]   (*See generally* Doc. 227 (among other authority citing *Lopez v.*

---

[10]       It was not certain to the undersigned whether Mr. Soto would testify at the time this matter was set down for an evidentiary hearing.   Thus, as to *Strickland*'s performance prong, the principle evidence before the Court at that time was Aracely's affidavit (which did not facially present allegations so incredible as to not be believable).   Moreover, because the Magistrate Judge did not preside over Aracely's trial, before the evidentiary hearing, the undersigned had never had occasion to observe "the demeanor and general credibility of the defendant[.]"   *Contra United States v. Hands*, No. CRIM.A. 97-0024-CB; Civ.A. 99-1087-CB, 2005 WL 1183213, at *8-10 (S.D. Ala. May 18, 2005) (in which, as to a particular habeas claim, this Court determined "a close review of the evidence submitted in addition to the record before the court is a sufficient hearing and adequate basis to deny defendant's claim.   A full testimonial hearing is not warranted or required[.]")   In *Hands*, unlike here, the habeas petition was handled directly by the trial judge, who had before him attorney affidavits "detailing" the events alleged to be the basis for relief, and was also in a position to deem the "defendant's affidavit [as to the particular claim] completely unworthy of credence."   *Id.*; *see also id.* at *9 ("[I]t is not the believability of counsel's testimony that convinces the court that live testimony would be unhelpful, but the incredibility of defendant's affidavit testimony."); *cf. Moss v. United States*, Nos. 8:06–cr–464–T–17TGW, 8:09–cv–2463–T–17TGW, 2010 WL 4056032, at *17 (M.D. Fla. Oct. 15, 2010) ("A district court faced with conflicting uncorroborated allegations of a section 2255 petitioner and uncorroborated allegations of the petitioner's former trial counsel concerning counsel's advice regarding the right to testify may not simply deny the petition based on a 'per se credit counsel in case of conflict rule' without making credibility findings.").

The evidentiary hearing thus afforded the Magistrate Judge the opportunity to both observe the credibility of Aracely and hear Mr. Soto's response to Aracely's allegation that his performance as to her right to testify was constitutionally deficient.

In setting this matter for an evidentiary hearing, the undersigned was also mindful of *Nichols v. Butler*, 953 F.2d 1550 (11th Cir. 1992) (en banc), in which the Eleventh Circuit, affirmed the district court's decision to grant a habeas petition—because the defendant's attorney coerced him into not testifying by threatening to withdraw mid-trial—and stated, "[t]he testimony of a criminal defendant at his one trial is unique and inherently significant."   *Id.* at 1553.   Clearly, "[t]he most persuasive counsel may not be

*United States*, 522 Fed. App'x 684 (11th Cir. June 26, 2013) (per curiam) (in which the Eleventh Circuit recently vacated an order denying habeas relief—on the ground that counsel violated a defendant's constitutional right to testify—and remanded the case for an evidentiary hearing).)

### 1.   The Right To Testify and Habeas Relief

> The law is clear that a criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial. This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel. The Eleventh Circuit has held that an ineffective assistance of counsel claim is the appropriate vehicle for a criminal defendant to raise an alleged violation of his right to testify. That is precisely the form that [Aracely's] claim has taken; therefore, the Court evaluates this ground for § 2255 relief (i.e., that counsel violated [their] constitutional rights by not allowing [her] to testify at trial) by reference to the legal standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides that a petitioner making a claim of ineffective assistance of counsel must show that: (1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense.

*United States v. Harris*, 613 F. Supp. 2d 1290, 1307 (S.D. Ala. 2009) (Steele, J.) (internal citations omitted or modified and quotation marks omitted).

"With respect to deficient performance, the Eleventh Circuit has recognized that a lawyer's performance may fall outside the range of competence demanded of attorneys in criminal cases if either (a) 'defense counsel refused to accept the defendant's decision to testify and would not call him to the stand;' or (b) 'defense

---

able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Id.* (quoting *Green v. United States*, 365 U.S. 301, 304 (1961)). "Indeed, '[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance.'" *Id.* at 1554 (quoting *United States v. Walker*, 772 F.2d 1172, 1179 (5th Cir. 1985)).

counsel never informed the defendant of the right to testify and that the ultimate decision belongs to the defendant.'" *Id.* (quoting *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir. 1992) (en banc)); *see Gallego v. United States*, 174 F.3d 1196, 1197 (11th Cir. 1999) (counsel's performance is deficient for *Strickland* purposes "[w]here counsel has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone"); *Harris*, 613 F. Supp. 2d at 1308 n.18 ("For a defense attorney simply to tell the defendant that the latter has a right to testify is not sufficient to satisfy the constitutional minimum level of performance." (citing *McGriff v. Department of Corrs.*, 338 F.3d 1231, 1237 (11th Cir. 2003) ("Counsel must advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify. . . . Absent such advice, the defendant cannot effectively waive his right to testify.")).[11]

Of course, even if Mr. Soto was deficient as to any advice given Aracely concerning her right to testify, and thus there are grounds to find deficient performance under *Strickland*, Aracely must still show that "but for any deficient

---

[11]    *See also Windley v. Lee*, No. 11 Civ. 1275(DLC), 2013 WL 2350431, at *26 (S.D.N.Y. May 16, 2013) ("[a]lthough counsel should always advise the defendant about the benefits and hazards of testifying and of not testifying, and may strongly advise the course that counsel thinks best, counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter" (quoting *Brown v. Artuz*, 124 F.3d 73, 79 (2d Cir. 1997))).

performance by counsel as to [her] right to testify, 'there is a reasonable probability that . . . the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to ***undermine confidence in the outcome***.'" *Harris*, 613 F. Supp. 2d at 1308-09 (quoting *Hannon v. Secretary, Dep't of Corrs.*, 562 F.3d 1146, 1151 (11th Cir. 2009) (citing *Strickland*, 466 U.S. at 694), and citing *Wood v. Allen*, 542 F.3d 1281, 1310 (11th Cir. 2008) ("A petitioner must affirmatively prove prejudice." (citation and internal quotation marks omitted)); *Lambrix v. Singletary*, 72 F.3d 1500, 1508 (11th Cir. 1996) ("a defense attorney renders ineffective assistance if he fails to adequately inform his client of the right to testify, and that failure prejudices the defense")) (emphasis added).   Aracely's claim that her counsel was constitutionally ineffective because she was refused her right to testify in her own defense, or was misadvised as to that right, succeeds or fails, therefore, on her ability to prove ***traditional*** *Strickland* prejudice.  That is, there is no lesser threshold of proof in the right-to-testify context.  *See, e.g., Harris*, 613 F. Supp. 2d at 1309 & n.20 ("[S]imply to say that he would have testified had he known the decision was his is not enough to establish prejudice.  There is no *per se* or presumed prejudice in this context." (collecting cases).[12]

---

[12]     *See also Richitelli v. United States*, Nos. 12–Cv–60647–COHN; 09–Cr–60229–COHN, 2013 WL 1332929, at *12 (S.D. Fla. Mar. 6, 2013) ("Here, even if the movant had testified, challenging the government's evidence, and further making a blanket assertion of innocence as to the charged offenses under attack here, no showing has been made that this would have affected the outcome of the proceeding, given the more than sufficient evidence adduced at trial, viewed in the light most favorable to the government, which included the testimony of the movant's co-conspirators and the movant's pre-trial recorded statements.  The evidence at trial amply demonstrates that the movant was actively involved in the offenses of conviction.  Thus, it is not likely that the result of the trial would have been different had the movant testified.  On cross-examination, the prosecutor would have been

## 2.   ***Strickland* Performance**

Aracely has not proven *Strickland*'s performance prong.   On cross-examination, Aracley admitted that although she first met with Mr. Soto in June 2008, she did not inform him that she wished to testify in her own defense until December 2008.   She testified that Mr. Soto told her she was not prepared to testify, and that once she explained she still wanted to testify, Mr. Soto responded that she was on her own.   Mr. Soto testified, however, that he discussed the right to testify with Aracely, that it is his general practice to encourage clients to testify, and that any words to the effect that Aracely "was on her own" if she chose to testify would have never come out of his mouth.   But on cross-examination, while Mr. Soto was steadfast in his belief that Aracely did not want to testify and never told him she wanted to testify, he did state the possibility of Aracely testifying may have been left open following the pretrial conference.

Of the two versions of events pertaining to Aracely's right to testify given at the evidentiary hearing, Mr. Soto's is found to be the most credible.   This determination is (1) based on the demeanor of the witnesses, and (2) made

---

able to elicit from the movant the fact that he had been previously convicted of 59 different felonies.   Consequently, the movant is not entitled to relief on this claim."), *report and recommendation adopted*, 2013 WL 1289164 (S.D. Fla. Mar. 28, 2013); *Windley*, 2013 WL 2350431, at *26 ("[O]n habeas review, 'any claim by the defendant that defense counsel has not discharged this responsibility—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in *Strickland* . . . , for assessing whether counsel has rendered constitutionally ineffective assistance.'   Accordingly, even if a habeas petitioner demonstrates that his counsel's performance was deficient for depriving him of the right to testify, the petitioner must then also show that he suffered actual prejudice as a result of the deprivation of that right." (quoting *Brown*, 124 F.3d at 79; citing *United States v. Murray*, 414 Fed. App'x 318, 321 (2d Cir. Jan. 26, 2011) (per curiam))).

considering their testimony in light of the record evidence. *Cf. Gallego*, 174 F.3d at 1198 ("While "[i]t is perfectly legitimate for the district court to find, based on all the evidence in the record, that a defendant's testimony about his participation in a drug scheme is not credible[,]" a court may not base that "decision on the fact that defendant's allegations were unsubstantiated and . . . contrary to that of counsel's" without first "weigh[ing] defendant's credibility."); *see also Moss*, 2010 WL 4056032, at *17. This finding is important, moreover, because of the uncorroborated, "he said-she said" nature of the evidence as to this issue. And based on the weight of the credible evidence, Aracely has not proven either that Mr. Soto either refused to accept her decision to testify, and then refused to call her to the stand, or that Mr. Soto failed to inform her of her rights—(1) to testify and (2) to make the ultimate decision whether she testified. *See Harris*, 613 F. Supp. 2d at 1307.

### 3. *Strickland* Prejudice

The undersigned also finds neither Aracely's declaration, nor her evidentiary hearing testimony, nor any presentation by her habeas counsel do anything "to undermine confidence in the outcome" of her trial, which therefore means there is no "reasonable probability that the result of the proceeding would have been different" and the prejudice prong of *Strickland* has not been proven. *Hannon*, 562 F.3d at 1151.

Aracely's declaration sets out four things she would have told the jury had she been able to testify. First, very generally, Aracley would have told the jury that she "never took part in any of the drug deals that [they] heard about . . . and that the government relied on for every one of [her] counts." (Doc. 209-1, ¶ 11(a).) Next,

Aracley would have testified that she "had money from other sources and did not need money bad enough to deal drugs." (Doc. 209-1, ¶ 11(b).) She would have specifically testified (1) regarding the $50,000 settlement she received following her husband's death (*see id.*); and (2) that her family generates between $6,000 and $7,000 annually from selling cattle in Mexico (*see id.*). Relatedly, Aracely also would have testified concerning her business selling hats, furniture, mattresses, and electronics—specifically, how those, she contends, legitimate and legal businesses were run. (*Id.*, ¶ 11(c); *see also id.* ("I would have told the jury that any financial transactions I engaged in, especially the ones that the government said amounted to money laundering, were legitimate and legal.").) Finally, Aracely would have offered testimony to explain "to the jury that Travis Ward gave me two checks[, for $3,000 and $9,000,] to purchase a bedroom suite and television" and that, contrary to Government's case against her, including the testimony of Ward, "these checks were [not] tied to drug dealing[.]" (Doc. 209-1, ¶ 11(d).)

Aracely testified regarding these points and expanded somewhat on them at the evidentiary hearing. The essence of her testimony there was that, had she testified at trial, she would have been able to explain that the "all cash" nature of her legitimate businesses, along with the unreported widow's benefit she received, accounted for the discrepancies in her tax filings. Aracely also testified that, had she taken the stand in her own defense, she would have offered alternative explanations for (1) her and Ramon's ill-fated trip to New York City; (2) evidence that she ran the drug business while Ramon was incarcerated in New York; and (3)

her relationship with the Knoxes (did she did not meet Alvin until her trial).  It is the undersigned's finding that Aracely's testimony, which offered very few details to support her alternative explanations, was neither believable nor convincing. *Gallego*, 174 F.3d at 1198.

Furthermore, as was made clear through the Government's cross-examination of Aracely, the substance of the testimony Aracely now contends she would have provided at trial was elicited through Mr. Soto's cross-examinations of Agent Henken, Travis Ward, and Alvin Knox.  Mr. Soto testified, moreover, that he "went after" Henken and was aggressive against the Government's assertion that Aracely ran the drug business during Ramon's absence.  Mr. Clark, Elda's trial counsel, also testified at the evidentiary hearing that the Government had ample substantive evidence against Aracely and Ramon—they "were up to their eyeballs."

Therefore, after the benefit of an evidentiary hearing, at which Aracely was not only afforded an opportunity to expand on her affidavit and "tell all" she would have said had she testified, but was also subject to cross-examination, it is abundantly clear—given the evidence at trial (both against her and already elicited in defense of her), as detailed above—that Aracely has failed to show there is a reasonable probability that the result of her trial would been different had she testified.  *Strickland* prejudice has thus not been proven. *Lambrix*, 72 F.3d at 1508; *Hannon*, 562 F.3d at 1151; *Harris*, 613 F. Supp. 2d at 1308-09.[13]

---

[13]       *See also Windley*, 2013 WL 2350431, at *27 ("[E]ven if this Court were to accept Petitioner's allegations that his trial counsel failed to inform him of his right to testify and then actually denied him a desired opportunity to testify at trial, Petitioner has not satisfied the second prong of the *Stickland* test by demonstrating that, had he testified,

4.     **Other IAC Claims**

Aracely also presents claims that Mr. Soto was ineffective because (1) he failed to investigate the case, and (2) failed to present exculpatory and mitigating evidence.  These claims are belied by the record, by the testimony at the evidentiary hearing, and by evidence submitted during that hearing.[14]  Aracely testified that Mr. Soto only visited her twice while she was in pretrial detention, and her habeas counsel attempted to introduce into evidence records from the Baldwin County Corrections Center, where she was detained pretrial, to corroborate this testimony.  Those records were, however, not even consistent with Aracley's testimony—they showed that Mr. Soto only visited Aracely once, after the trial but prior to

---

the outcome of his trial would have likely been different" . . . because, at an evidentiary hearing, the petitioner "was unable meaningfully to address specific and incriminating evidence against him[.] . . . [T]here was therefore no reasonable probability that the result would have been different had Petitioner testified." (internal citation and quotation marks omitted)); *Sondey v. White*, No. 05–71831, 2009 WL 4800413, at *23 (E.D. Mich. Dec. 9, 2009) ("Nothing in petitioner's testimony at the evidentiary hearing establishes that he could recall the details of the incident at the time of trial, and even petitioner's later-recalled version of events would not have created a reasonable probability of a different result had petitioner testified at trial.  Because counsel's advice was reasonable in light of the circumstances of the case, and because petitioner cannot demonstrate prejudice, the Court should conclude that petitioner is not entitled to habeas relief on this claim.") (order adopting Magistrate Judge's report and recommendation).

   [14]     Aracely makes two statements in her declaration concerning Mr. Soto's purported failure to (1) review documents prior to trial with her, (2) discuss the possibility of a plea bargain/cooperation with the Government with her, and (3) review materials information related to sentencing with her.  (*See* Doc. 209-1, ¶¶ 12, 13.)  These contentions were neither developed in Aracely's petition nor touched upon during her evidentiary hearing.  But none of them appear plausible in light of the record evidence and evidentiary hearing testimony.  First, as discussed further below, Mr. Soto testified that much of the documents Aracely and her family thought were important were irrelevant to her defense.  Second, Mr. Soto's records reflect his efforts to communicate with the Government (and Aracely) with regard to a plea deal.  And, third, those records also reflect two trips to see Aracely after the trial and prior to sentencing and other work related to sentencing preparation.

sentencing—and were ultimately found to be not reliable.[15]   Moreover, Mr. Soto

provided his own internal closed file memo (Doc. 254), admitted under seal as the

Government's first (and sole) exhibit—the reliability of which was not questioned—

tracking his meetings with Aracely and members of her family.[16]   Mr. Soto's closed

file memo also documents his review of discovery from the Government, and he

testified that the family provided a lot of documents, a lot of which he considered to

be irrelevant to Aracley's defense.[17]   Finally, Mr. Soto's representation of Aracely

during trial, particularly his aggressive cross-examination of Agent Henken and

Alvin Knox, is completely inconsistent with any habeas claim that he failed to elicit

evidence favorable to Aracely during trial.[18]

---

[15]     While counsel for Aracely and Elda Lopez withdrew the request to admit the records, it should be noted that Mr. Soto; Mr. Clark, Edla's trial counsel; and counsel for the United States all remarked that the facility uses a rather antiquated means to track visitors, under which, if a visitor either fails to sign-in or his or her signature is illegible, it is likely the visit will not be logged.

[16]     Aracely's daughter, Sandra Lopez, who, according to Mr. Soto, ran point for the family with regard to her mother and sister's defense, hired him.   While Mr. Soto's records show few direct meetings with Aracely at the corrections center, his records reflect numerous telephone conferences with Sandra, and he also testified that he met with many members of Aracely's family during the course of the representation; this is also consistent with Mr. Soto's record.

[17]     In this regard, at the evidentiary hearing, habeas counsel for Aracely referenced a box full of documents that were not used at trial, but which support her version of the events underlying her conviction.   It is significant that, while given an opportunity to show these documents to the Court (by virtue of the undersigning setting this matter down for an evidentiary hearing), Aracely and Elda's counsel failed to do so.

[18]     It is noteworthy that Mr. Soto and Mr. Clark both testified that Aracely was stubborn with regard to proceeding to trial, even after being counseled that the jury empaneled did not bode well for her.   Mr. Soto testified that she was fatalistic and insisted "God would sort it out."   And, indeed, Mr. Soto's records document a "horrible" jury and the "need to cut a deal," to which it appears Aracely responded, "God will sort it out."   This evidence, of her unwillingness to plea, also directly undercuts the veracity of Aracely's testimony in light of her claim that Mr. Soto "never talked to [her] about any possibilities of

### III.   <u>Certificate of Appealability</u>

Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 18 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may only issue where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2243(c)(2).

Aracely is not entitled to a certificate of appealability on her ineffective-assistance-of-counsel claims. Where a habeas petition is being denied entirely on the merits of an underlying constitutional claim, as is the case for Aracely's IAC and fair and impartial jury claims, a COA should issue only when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also id.* at 483-84 ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983), includes a showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or

---

a plea bargain . . . ."  (Doc. 209-1, ¶ 12.)

29

that the issues presented were adequate to deserve encouragement to proceed further.") (quotation modified).  With respect to Aracely's claims, the undersigned **recommends** that the Court find that reasonable jurists could not debate whether his § 2255 motion to vacate should be resolved in a different manner or that any of the remaining issues presented is adequate to deserve encouragement to proceed further.  Accordingly, Aracely is not entitled to a certificate of appealability as to these claims.

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  If there is an objection to this recommendation, the objecting party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.  *See, e.g.*, *Brightwell v. Patterson*, No. CA 11-0165-WS-C, 2011 WL 1930676, at *6 (S.D. Ala. Apr. 11, 2011), *report & recommendation adopted*, 2011 WL 1930662 (S.D. Ala. May 19, 2011)[19]; *Griffin v. DeRosa*, No. 3:10cv342/RV/MD, 2010 WL 3943702, at *4 (N.D. Fla. Sep. 20, 2010) (providing for same procedure), *report & recommendation adopted sub nom. Griffin v. Butterworth*, 2010 W: 3943699 (N.D. Oct. 5, 2010).

## IV.   **Conclusion**

After a thorough review of the record and the parties' briefing, and after the benefit of an evidentiary hearing at which the petitioner and her trial counsel

---

[19]     It should be noted that in that proceeding, the Eleventh Circuit (Judge Hull) also denied the petitioner's motion for certificate of appealability, on October 11, 2011.  (*See* Doc. 14 in CA-11-0165-WS-C.)

testified, the Magistrate Judge finds that Aracely Lopez has not shown that her rights were violated—she has neither proven that she was denied her right to a fair and impartial jury nor proven that her trial counsel did not function as the "counsel" guaranteed a defendant by the Sixth Amendment.   It is therefore **RECOMMENDED** that her § 2255 petition (Docs. 204, 209) be **DENIED**.   The Magistrate Judge **FURTHER RECOMMENDS** that the Court find that she is not entitled to a certificate of appealability and, therefore, is not entitled to appeal *in forma pauperis.*

## V.   Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.   *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); S.D. ALA. L.R. 72.4.   In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.   An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 3rd day of June, 2014.

 */s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**